UNITED STATES BANKRUPTCY COURT                    **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
In re                                               :
                                                    :    Chapter 11
SOUNDVIEW ELITE LTD., *et al.*,                     :    Case No. 13-13098 (MKV)
                                                    :    (Jointly Administered)
                              Debtors.              :
----------------------------------------------------------------x
In re                                               :
                                                    :    Chapter 15
RICHCOURT EURO STRATEGIES INC., *et al.*,           :    Case No. 15-12273 (MKV)
                                                    :    (Jointly Administered)
                              Debtors.              :
----------------------------------------------------------------x

## MEMORANDUM OPINION AND ORDER ON
## COMPETING MOTIONS WITH RESPECT TO STAY RELIEF

**A P P E A R A N C E S :**

DICONZA TRAURIG KADISH LLP
*Special Litigation Counsel for the Chapter 11 Trustee of the Soundview Debtors*
*And the Joint Liquidators of the Richcourt British Virgin Island Funds*
630 Third Avenue
New York, New York 10017
By:    Gerard DiConza, Esq.
       Richard Milin, Esq. (argued)

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
*Counsel for Pasig Ltd., Roger Corman and Julie Corman*
1633 Broadway
New York, New York 10019
By:    Andrew K. Glenn, Esq. (argued)

**MARY KAY VYSKOCIL**
**UNITED STATES BANKRUPTCY JUDGE**:

Before the Court are two motions (the "Mirror Motions"), *one* jointly filed by Corinne Ball, in her capacity as the Chapter 11 Trustee of the Soundview debtors (the "Trustee"), and John Ayres and Matthew Wright, in their capacities as Joint Liquidators of certain other related debtors located in the British Virgin Islands[1] (together with the Trustee, the "Trustees"), and the *other* filed by creditors Pasig Ltd. and its owners Julie and Roger Corman (the "Cormans").[2] *First*, the Trustees move to stay and enjoin prosecution by Pasig and the Cormans of their Second Amended Complaint filed in the Superior Court of California, case no. BC576379 (the "California Action") against Citco Group Limited and certain of its affiliated entities ("Citco") [ECF No. 972][3] ("Stay Motion II"). In Stay Motion II, the Trustees argue that the California Action violates the automatic stay and should be enjoined because the claims being asserted belong to the Debtors. Pasig and the Cormans contend that they are pursuing their own individual claims for injuries independent of the Debtors. *See "Objection" to Stay Motion II.* [ECF No. 981]. *Second*, Pasig and the Cormans seek in their motion relief from the automatic

---

[1] The related debtors are America Alternative Investments Inc., Optima Absolute Return Fund Ltd., Richcourt Allweather B Inc., Richcourt Allweather Fund Inc., Richcourt Composite Inc., and Richcourt Euro Strategies Inc. (collectively, the "BVI Debtors").

[2] "The Cormans are the owners of Pasig and the owners of all assets held by Pasig, including all monies, bank and investment accounts held in the name of nominee Pasig." *Declaration of Richard Milin in Support of Debtors' Objection to Motion of Pasig, Ltc., Roger Corman and Julie Corman for Relief from the Automatic Stay* ("Milin Decl.") [ECF No. 1211], Exh. 4 (the "Sec. Am. Compl.") at ¶ 3.

[3] Unless otherwise specified, references to the filings on the Court's electronic docket are in Case No. 13-13098.

stay, to the extent it applies, to permit litigation of their Second Amended Complaint in the California Action. [ECF No. 1179] (the "Pasig Motion").[4]

The dispositive issue raised by both motions is whether the claims in the Second Amended Complaint are non-derivative, individual claims that establish particularized injuries to Pasig and the Cormans directly traceable to the defendants, or conversely, whether the Second Amended Complaint impermissibly asserts claims that belong to the Debtors or seeks derivatively to redress injury to the Debtors and/or the general creditor body. For the reasons set forth below, the Court denies Stay Motion II and grants the Pasig Motion as set forth herein.

## BACKGROUND

Prior to the petition date, Soundview Elite Ltd. and its affiliated entities (collectively, the "Soundview Debtors")[5] were open-ended investment companies registered in the Cayman Islands. Both the Soundview Debtors and the BVI Debtors (collectively, the "Debtors") were created and owned by Citco until they were acquired in 2008 by Alphonse "Buddy" Fletcher (the "Richcourt Acquisition"). As a result of the Richcourt Acquisition, Fletcher Asset Management ("FAM") obtained a majority interest in the Debtors, and the Debtors became part of a family of investment funds managed by Fletcher and his related entities. Following the Richcourt Acquisition, Citco continued to provide certain services to the Debtors.

---

[4] The original motion to lift the stay is at ECF No. 1072. Pasig amended the stay motion solely to include reference to a court-directed mediation and related Orders in the recitation of the background and facts.

[5] The "Soundview Debtors" are Soundview Elite, Ltd., Soundview Premium, Ltd., Soundview Star, Ltd., Elite Designated, Star Designated, and Premium Designated.

## Proceedings in this Court

The six Soundview Debtors filed their respective chapter 11 petitions on September 24, 2013, and the cases are being jointly administered. *See* ECF No. 40. Subsequently, Corrine Ball, Esq. was appointed the Chapter 11 Trustee of the Soundview Debtors. ECF No. 164. While the chapter 11 cases were pending, the BVI Debtors filed for liquidation in the BVI, and John Ayres and Matthew Wright were approved as Joint Liquidators in the BVI proceedings. Thereafter, the Joint Liquidators commenced chapter 15 cases, and the Court has since granted recognition. *See* Recognition Order, Case No. 15-12273, ECF No. 13.

After her appointment, the Trustees commenced, on behalf of both the Soundview and BVI Debtors, an adversary proceeding (the "Citco Adversary Proceeding") alleging that Citco participated in Fletcher's mismanagement of the Debtor funds and seeking, among other things, damages for Citco's alleged breach of its fiduciary duties owed to the Debtors, aiding and abetting breach of fiduciary duties, fraud, and unjust enrichment. *See* Amended Complaint, Adv. P. No. 15-01346, ECF No. 52.[6]

## The California Action

In the 1990s, the Cormans had invested with investment manager George Soros. *See* Pasig Motion [ECF No. 1179] at ¶ 10. At that time, a Citco entity provided

---

[6] Pursuant to *the Cross-Border Insolvency Protocol Regarding Soundview Elite Ltd., Soundview Premium Ltd, and Soundview Star Ltd.* (the "Protocol") [ECF No. 502] and the *Addendum to Cross-Border Insolvency Protocol Regarding Soundview Elite Ltd., Soundview Premium Ltd, and Soundview Star Ltd.* [ECF No. 997], which were authorized by this Court, the Trustee of the Soundview Debtors and the Joint Liquidators of the BVI Debtors coordinate with respect to certain aspects of the two bankruptcy cases, including the pending motions and commencement of the Citco Adversary Proceeding. *See* Protocol ¶ 6.1.

administrative services to Soros Assets. *See* Pasig Motion at ¶ 11. In 1996, Ermanno

Unternaehrer, a Citco executive, purportedly told the Cormans they would be better off

if they transferred some of their investments to investment vehicles managed by Citco.

*See* Pasig Motion at ¶ 12.

Allegedly relying on a number of Citco's representations, the Cormans decided to

move their investments from Soros and invest money with Citco-related entities. *See*

Pasig Motion at ¶ 13–14. To facilitate these investments, in the early 2000s, on the

advice of Unternaehrer, the Cormans formed Pasig Ltd. ("Pasig"), a BVI entity, to serve

as their personal investment vehicle. *See Decl. of Richard K. Milin in Support of*

*Debtors' Objection to Motion of Pasig, LTD., Roger Corman and Julie Corman for*

*Relief From The Automatic Stay*, (the "Milin Decl.") [ECF No. 1211], Exh. 4 (the "Sec.

Am. Complaint") at ¶¶ 43–44. In June 2008, after the Richcourt Acquisition, Citco

transferred to the Debtor funds managed by Fletcher, allegedly without the knowledge

of the Cormans, approximately $73 million of the Cormans' investment, including their

interests in Pasig. *See* Sec. Am. Complaint ¶ 55. After the transfer to Fletcher, Citco

continued to provide administrative services for the investments of Pasig and the

Cormans. *See* Sec. Am. Complaint ¶ 60.  By November 2008, the Cormans' investments

allegedly were insolvent, and the Cormans were restricted from withdrawing their

invested funds. *See* Sec. Am. Complaint ¶ 74.

On March 23, 2015, Pasig and the Cormans commenced the California Action by

filing a complaint (the "Original Complaint") against Citco and related parties (the

"Citco Defendants") in California state court. Pasig and the Cormans sought damages

caused by Citco's alleged breach of fiduciary duties and contractual obligations to the

Cormans, among other things. At the core of the Original Complaint are Citco's specific

representations, which the Cormans allege they reasonably relied on when entering into agreements with Citco to become the Cormans' personal financial advisor.

Citco moved to quash the Original Complaint, arguing that the California court lacked personal jurisdiction over the Citco Defendants. Pasig and the Cormans opposed the motion, and cross-moved for an expedited trial, due in part to Mr. Corman's advanced age. Denying Citco's motions, the California court found that it had personal jurisdiction over the Citco Defendants[7] and ordered an expedited trial based on Mr. Corman's age and failing health.

Shortly after the California court's ruling, Pasig and the Cormans filed the First Amended Complaint, in response to which certain Citco Defendants filed demurrers arguing that the Cormans lacked standing to recover for losses of Pasig. The California court rejected Citco's argument, finding that the First Amended Complaint was based on Citco's alleged wrongful conduct as the Cormans' personal investment advisors, and not on the Cormans' status as Pasig shareholders. On that basis, the California court overruled the demurrers and held that none of the Cormans' claims were derivative of Pasig and therefore, the Cormans had standing to bring the claims individually against Citco. *See* Milin Decl., Exh. 7 at 6.

### *Stay Motion I and Judge Gerber's Ruling*

While the motions addressed to the pleadings in the California Action were being litigated, the Trustees filed in this Court a *Motion to Enforce the Automatic Stay and to*

---

[7] Specifically, the California court denied the motions to quash for lack of personal jurisdiction by "specially appearing defendants" Citco Group Limited; Citco Group (Monaco) SAM; Citco Global Custody (N.A.) N.V.; Tortrust Corporation Company Ltd.; Citco Trustees S.A.; Citco B.V.I. Limited; Citco Bank & Trust Company Limited; Citco Banking Corporation N.V.; Securitas Management Services Corp.; Citco Fund Services (Cayman Islands) Ltd.; Citco Suisse S.A.; Ermanno Unternaehrer; and Christopher Smeets. *See* Milin Decl., Exh. 5 at 5.

*Enjoin Prosecution By Pasig, Ltd. and Roger and Julie Corman of Claims Belonging to the Debtors' Estates*. ECF No. 908 ("Stay Motion I"). In Stay Motion I, the Trustees sought to enjoin Pasig and the Cormans from prosecuting their claims in the Original Complaint against the Citco Defendants in the California Action. The Trustees' primary argument was that the automatic stay bars Pasig and the Cormans from litigating "derivative" claims because such claims are property of the Debtors' estates. *See* Stay Motion I at 11.  Specifically, the Trustees argued that "Pasig, one of the Debtor's pre-petition investors . . . improperly usurped claims that belong to the Debtors' estates by filing" their action against Citco in California. *See* Stay Motion I ¶ 1. The Trustees contended that the theories, allegations, injuries, damages, and defendants in the California Action were the same as plead in the Trustees' adversary proceeding in this Court against Citco on behalf of the Debtors.

In the alternative, the Trustees argued that, even if the Court found the claims were viable and not derivative, the California litigation should be stayed in order to protect property of the Debtors' estates. The crux of the alternative argument was that "Pasig's California litigation unilaterally carves out a share of the estate's litigation claims and seizes control of those claims for its own benefit." Stay Motion I ¶ 49. This, the Trustees contended, would prejudice the Debtors in litigating or settling their own claims in the Citco Adversary Proceeding.

In their objection to Stay Motion I [ECF No. 914] ("Obj. Stay Motion I"), Pasig and the Cormans argued that the automatic stay did not apply to their "direct" claims asserted in the California Action against the Citco Defendants, all non-debtor entities.[8]

---

[8] On the same day, the Cormans filed the First Amended Complaint in the California Action.

Specifically, they argued that their claims "stem from Citco's standing as the Cormans and Pasig's longstanding investment advisor distinct and apart from their management of the Citco funds." Obj. Stay Motion I, ¶ 30.

Judge Gerber denied Stay Motion I, and thus permitted Pasig and the Cormans to continue to pursue the California Action against Citco. In doing so, Judge Gerber found that "the amended complaint [is] premised solely on [the Citco Defendants'] alleged individual breaches of duty to the Cormans and Pasig alone, and does not rely on any injuries to the investor body of the Richcourt funds or the successors . . . in any material way or in any way that is anything other than a secondary injury." *December 16, 2015 Hearing Transcript* [ECF No. 939] ("Hrg. Tr."), at 43:20–44:2.

Judge Gerber expressly relied on paragraphs 37–38, 45, 47–48, 51, 54, 59–60, 70, 75, 82, 99, 101, 115, 130, and 133 of the First Amended Complaint to support the finding that "the underlying gist of the complaint [in the California Action] is that [Pasig and the Cormans'] advisers served them badly." Hrg. Tr. at 45:12–15. Therefore, Judge Gerber held that while certain of Pasig and the Cormans' claims may be "secondary," "[t]hat doesn't make their claims against their advisor derivative claims." Hrg. Tr. at 55:5–7. Denying the Trustees' Stay Motion I, Judge Gerber explicitly found: "what Pasig and the Cormans may recover is not now property of the estate and may never be." Hrg. Tr. at 56:20–21. Therefore, Pasig and the Cormans were not trying to usurp the estates' rights. An Order denying Stay Motion I subsequently was entered. ECF No. 945 ("Stay I Denial Order").

In his decision, Judge Gerber was conscious of the implications any damages awarded in the California Action potentially could have on the Trustees' prosecution of the Citco Adversary Proceeding and on the Debtors' estates. To address this concern,

8

Judge Gerber "encourage[d] the Cormans and Pasig to consider [asking] for special findings [in the trial of the California Action] so that if any facts are ascertained in their trial, such facts can potentially be used in any subsequent proceedings" before this Court. Hrg. Tr. at 57:7–12.

### Stay Motion II and the Pasig Motion

Notably, as pointed out by counsel for Pasig and the Cormans, and conceded by counsel for the Trustees on the record at the hearing on the motions now before the Court, the Trustees did not seek to stay Judge Gerber's order, and Pasig and the Cormans would have been "free to settle" on the First Amended Complaint "at any time." *See October 20, 2016 Hearing Transcript* [ECF No. 1229] at 80:7–9; 81:13–21. The parties to the California Action did not do so.

Within a month of Judge Gerber's ruling, Pasig and the Cormans filed their Second Amended Complaint in the California Action,[9] in effect, mooting the Stay I Denial Order (and the Trustees' appeal of that order).[10] In response, the Trustees filed Stay Motion II, again arguing that the California Action should be stayed because Pasig and the Cormans are prosecuting claims for "secondary harms" that are "derivative" of claims that belong to the Debtors' estates. In their Stay Motion II, the Trustees urge that, in order to protect the Debtors' estates and the creditor body as a whole, the Trustees must litigate the claims in the Citco Adversary Proceeding before Pasig and the Cormans should be able to proceed in California.

---

[9] *See* Milin Decl. [ECF No. 1211], Exh. 4, Sec. Am. Complaint.

[10] The Trustees' appeal of the Stay I Denial Order was dismissed, without prejudice, as moot after Pasig and the Cormans filed their Second Amended Complaint.

The Trustees again argue that both the California Action and the Citco Adversary Proceeding are against the same key Citco defendants, allege the same wrongdoing, assert the same key causes of action, allege the same harm, and seek the same damages. *See* Stay Motion II at 14–17. The Trustees' four main arguments are:

    (i)    the California Action violates the stay because it exercises control over property of the estate;

    (ii)    the California Action should be stayed because Pasig and the Cormans are asserting "derivative claims" for "secondary harm" to the Debtors which should be for the benefit of the creditor community at large;

    (iii)    the existence of "independent duties" owed by the Citco Defendants does not entitle Pasig and the Cormans to pursue the California Action unless a "particularized injury" was alleged; and

    (iv)    even if the California Action does not violate the stay, it nevertheless should be enjoined under Bankruptcy Code section 105(a).

*See* Stay Motion II at 18–26.

Pasig and the Cormans filed an objection to Stay Motion II ("Obj. Stay Motion II") [ECF No. 981]. Shortly thereafter, Chief Judge Morris (who presided over this case following Judge Gerber's retirement) directed mediation among the Trustees, Pasig, the Cormans, the Citco Defendants, and the individual defendants in the Citco Adversary Proceeding (Fletcher, George Ladner, Floyd Saunders, and Denis Kiely). *See* ECF No. 1051. Stay Motion II was held in abeyance pending the outcome of the mediation. On the eve of mediation, Pasig and the Cormans filed, but neither served nor noticed for hearing, a *Motion for Relief From the Automatic Stay, to the Extent Applicable, to Permit Litigation of Their Second Amended Complaint in the California State Court* (the "Initial Pasig Motion") [ECF No. 1072]. The Initial Pasig Motion basically mirrors the Trustees' Stay Motion II, and seeks authorization to proceed with the California Action.

After the mediation failed, Pasig and the Cormans amended their motion to include solely the mediation's procedural history. By this time, the Cormans and the Citco Defendants had reached a tentative agreement to settle the claims asserted in the California Action that was memorialized in a Memorandum of Understanding (the "MOU"), which they hoped to consummate.

In response to the Pasig motions, the Trustees objected [ECF No. 1210], *inter alia*, on the ground that they had requested a copy of the MOU, which Pasig and the Cormans had refused to provide. The Trustees further argued that, by reason of the "internal affairs doctrine," the Cormans, who invested though the Pasig vehicle that they created in the BVI, lack standing under Cayman law (with respect to the Soundview Funds) and BVI law (with respect to the Richcourt Funds)[11] to pursue claims for "reflective losses," *i.e.*, losses that the company could recover if Pasig had brought the action.[12]

---

[11] Under New York law, the internal affairs doctrine "generally requires that "questions relating to the internal affairs of corporations are decided in accordance with the law of the place of incorporation." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 191 (S.D.N.Y. 2006) (internal quotation omitted).The *Montreal Pension Plan* Court reasoned:

> This doctrine recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands. However, the New York Court of Appeals has rejected any automatic application of the so-called "internal affairs" choice-of-law rule. In certain circumstances application of the local law of some other state is required by reason of the overriding interest of that other state in the issue to be decided. The principles compelling a forum state to apply foreign law come into play only when a legitimate and substantial interest of another state would thereby be served.

*Id.* (internal quotations and citations omitted).

[12] As stated by one New York court, "[u]nder Cayman law, shareholders may not recover 'reflective losses,' which are losses that the company itself could recover if it chose to initiate legal action. The Cayman courts have held that [w]here a company suffers loss caused by a breach of duty owed to it, only the company may sue in respect of that loss. No action lies at the suit of a shareholder suing in that capacity and no other to make good a diminution in the value of the shareholder's shareholding where that merely reflects the loss by the company . . . there is no discretion involved. A shareholder cannot sue

In their reply to the Trustees' objection [ECF No. 1212], Pasig and the Cormans argue that (1) the Trustees cannot demonstrate that the stay applies; (2) the Trustees have no basis to demand a copy of the MOU between the parties to the California Action; (3) Judge Gerber's earlier decision allowing the California Action to go forward is law of the case; and (4) the automatic stay, to the extent it applies, should be lifted. Pasig and the Cormans represent that the proposed settlement of the California Action resolves *only* individual claims of Pasig and the Cormans and does not encroach on any claim that belongs to the Debtors. In support of this contention, Citco's counsel submitted a declaration in connection with the Pasig Motion [ECF No. 1214] (the "Citco Declaration") in which he represents that "[i]n its acceptance of the settlement proposal of the California Action, Citco confirmed, in writing, 'Citco is not paying any of the settlement amount on the claims of the Trustee[s] and is paying all of the settlement amount to settle claims individually owned by the Cormans. . . .'" Citco Decl. ¶ 3.13

---

in a personal capacity for a loss unless that loss is distinct from that of the company, and this rule applies regardless of whether the company itself intends to sue." *Davis v. Scottis Re Grp., Ltd.*, 138 A.D.3d 230, 234, (1st Dep't 2016) (internal quotations and citations omitted).

13 The Citco Defendants are not parties to, and did not appear at the hearing on the Mirror Motions. Nonetheless, after the hearing, Citco's counsel in the Adversary Proceeding filed a letter on the docket in the main case [ECF No. 1231] (the "Citco Letter"), which addressed discussions at the hearing on the pending Mirror Motions regarding the potential for a double recovery of damages by Pasig and the Cormans by reason of their California Action against Citco and the Trustees' adversary proceeding against Citco. The Citco Letter also addressed whether Citco should be estopped from attempting to offset any amount for which it is found liable to the estate in the Citco Adversary Proceeding by amounts paid to Pasig and the Cormans in the California Action. In response to the Citco Letter, the Trustee argues that the Cormans' settlement should be stayed because preserving Citco's ability to offset any settlement in the California Action against any recovery the estates may have against Citco presents an ongoing threat to the Citco Adversary Proceeding. *See* ECF No. 1232. In reply [ECF No. 1233], the Citco Defendants argue that, without knowing what the extent of damages against Citco will be in the Citco Adversary Proceeding, or the scope of any releases in the settlement of the California Action, it is premature for the Citco Defendants to waive or be judicially estopped from raising any potential arguments with respect to the Debtors' alleged damages. In response to the three post-hearing letter submissions, Pasig and the Cormans also filed a letter on the docket [ECF No. 1244] in which they stress that the agreement between the parties to the California Action is to settle the Cormans' *individual* claims, and not those of the Debtors. Pasig and the Cormans also point out that none of the parties has demonstrated, by evidence or

At the hearing on the Mirror Motions, counsel for Pasig and the Cormans stated that he was comfortable showing the MOU to the Court. *See* Oct. 20 Hrg. Tr. at 45:19–21; 46:1–2. The Court reviewed the MOU *in camera*, and counsel for Pasig and the Cormans subsequently provided the document to the Trustees with the settlement amount redacted, thereby mooting the Trustees' objection to the Pasig Motion based on lack of access to the MOU.

## ANALYSIS

### *The Automatic Stay*

Under Bankruptcy Code section 362, "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor" is stayed against all entities. 11 U.S.C. § 362(a)(1). One of the primary goals of the automatic stay is to protect property of the estate and thereby ensure equal treatment among, and provide equal protection to, all creditors of a debtor. *See St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 700–01 (2d Cir. 1989). Indeed, absent the automatic stay, "certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors." H.R. Rep. No. 595, 95th Cong., 2nd Sess. 340 (1978); *see also St. Paul Fire & Marine Ins. Co.*, 884 F.2d at 700–01. Thus, the automatic stay ensures equal treatment of creditors, leading to the orderly collection and distribution of a debtor's assets. However, "[a]s a general rule, independent third party claims against non-debtor parties are not subject to the automatic stay." *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv.*

---

otherwise, that the settlement of an individual claim can impact claims asserted on behalf of a bankruptcy estate.

*Sec. LLC*, 490 B.R. 59, 66–67 (S.D.N.Y. 2013), *aff'd sub nom. Picard v. Fairfield Greenwich Ltd.,* 762 F.3d 199 (2d Cir. 2014).

The Bankruptcy Code defines "property" of a debtor's estate to include "all legal or equitable interests of the debtor in property as of the commencement of the case," "wherever located and by whomever held." 11 U.S.C. § 541(a)(1). This includes "the estate's causes of action." *Picard v. Madoff (In re BLMIS),* 458 B.R. 87, 123 (Bankr.S.D.N.Y.2011) (citing *In re Smart World Techs., LLC,* 423 F.3d 166, 175 (2d Cir. 2005)). Notwithstanding the breadth of section 541, "the trustee does not seize control over a cause of action that belongs solely to a debtor's creditors or shareholders." *In re Lehr Constr. Corp.*, Case No. 11-10723 (SHL), 2015 WL 5174467, at *5 (Bankr. S.D.N.Y. Sept. 2, 2015) (internal citations omitted). Rather, a debtor may only pursue those causes of action that it could have pursued outside of bankruptcy. *See Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991).

Case law applying these basic principles makes clear that among the claims that only a debtor—and not a debtor's creditors—may pursue is a "general claim," understood to be a claim "with no particularized injury arising from it," and which could be  "brought by any creditor of [a] debtor . . . ." *St. Paul Fire & Marine Ins. Co.*, 884 F.2d at 701. One type of general claim which only a debtor has standing to pursue is a "derivative claim." *See In re WorldCom, Inc.*, 323 B.R. 844, 857 (Bankr. S.D.N.Y. 2005) (holding a derivative action is property of the estate and could only be brought by the debtor). In the bankruptcy context, "derivative claims" are those "that 'arise . . . from harm done to the estate' and that 'seek . . . relief against third parties that pushed the debtor into bankruptcy.'" *In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81, 89 (2d Cir. 2014) ("*Marshall*") (internal citation omitted); *see also In re Bernard L. Madoff*

*Inv. Sec. LLC.*, 721 F.3d 54, 70 (2d. Cir. 2013) ("[W]hen a creditor seeks relief against third parties that pushed the debtor into bankruptcy, the creditor is asserting a derivative claim that arises from harm done to the estate."). In the Second Circuit, "[a] claim based on rights 'derivative' of, or 'derived' from, the debtor's typically involves property of the estate." *Marshall*, 740 F.3d at 88. As such, the automatic stay prevents creditors from pursuing those claims.

Conversely, the automatic stay does not bar a creditor from pursuing individual or personal claims for particularized injury belonging to the creditor, even where the debtor may also have claims against the same third party. *See Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1101 (2d Cir. 1988). Where a claim alleges injuries that flow from harm to a debtor's estate, the harm is considered "secondary." Where secondary injury to a creditor can be particularized and directly attributed to a third party, that creditor will have a personal claim against the third party. "While a derivative injury is based upon 'a secondary effect from harm done to [the debtor],' an injury is said to be 'particularized' when it can be 'directly traced to [a third party's] conduct.'" *Marshall*, 740 F.3d at 89 (quoting *St. Paul Fire & Marine Ins. Co.*, 884 F.2d at 704). In other words, the claim is independent of any that might be property of a debtor's estate, and therefore, may be pursued by the individual creditor.

Often, "the same factual allegations may give rise to both derivative and independent claims." *In re Bernard L. Madoff Inv. Sec. LLC*, 531 B.R. 345, 351 (S.D.N.Y. 2015) (citing *Marshall*, 740 F.3d at 91–93). A creditor does "not state independent claims merely by asserting new legal claims or seeking different forms of relief than" the relief pursued by a debtor. *Id.* The critical feature is that "a non-derivative claim arises from the wrongdoer's breach of a separate legal obligation owed to the victim . . . that

results in an injury particularized as to the victim." *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. P. No. 08-01789 (SMB), 2017 WL 921963, at *4 (Bankr. S.D.N.Y. Mar. 7, 2017) (internal citations omitted). In determining whether claims are derivative or independent, courts "inquire into the factual origins of the injury and, more importantly, into the nature of the legal claims asserted." *Marshall*, 740 F.3d at 89 (citing *Johns–Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns–Manville Corp.)* *("Manville III")*, 517 F.3d 52, 67 (2d Cir.2008)). If after that inquiry, the Court determines creditors "have a claim for injury that is particularized as to them, they are exclusively entitled to pursue that claim, and the bankruptcy trustee is precluded from doing so." *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1093 (2d Cir. 1995).

### General (Derivative) v. Personal (Individual) Claims

None of the cases expounding the rules governing derivative versus individual claims in the Second Circuit arise in a factual context identical to this case. The governing law has been developed largely in the context of enforcement of injunctions, issued as part of chapter 11 plans. For example, the Second Circuit has spoken extensively on the bankruptcy court's authority to enjoin derivative claims in the context of the Johns-Manville asbestos bankruptcy. Before Manville filed for bankruptcy, it had been engaged in litigation with its insurers regarding insurance coverage for its liabilities arising from asbestos. *See MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.) ("Manville I")*, 837 F.2d 89, 90 (2d Cir. 1988). During the course of its bankruptcy case, Manville entered into a settlement of certain of those coverage actions, pursuant to which the settling insurers made cash payments to the Manville estate, and in exchange, were released with respect to their obligations under the insurance policies and protected from future claims based on those obligations. *See Id.*

To effectuate the settlement, the bankruptcy court entered an injunction that both relieved the insurers of their obligations and channeled any claims to the settlement funds. *See Id.*

In *Manville I*, MacArthur, a distributer of Manville's asbestos products, argued that it was insured under certain of the Manville insurance policies as a vendor of Manville products. *See Id.* MacArthur challenged the bankruptcy court's authority to enter the injunctions, and argued that its claims against settling insurers were contractual and separate from Manville's rights. *See Id.* at 90–91. The Second Circuit held that "MacArthur's rights as an insured vendor [were] completely derivative of Manville's rights as the primary insured," and like the asbestos victims, the claims asserted sought a recovery from the settlement proceeds for Manville's conduct" in relation to the same types of injuries. *See Id.* at 92–93. Thus, the claims were properly channeled by the injunction and could not be pursued by MacArthur. *See Id.* at 93.

Conversely, in *Manville III*, the Second Circuit held that certain claims against Travelers, Manville's primary insurer, were independent of claims against or belonging to Manville and therefore were not barred by the bankruptcy court's channeling injunction.[14] *See* 517 F.3d at 68. At issue in *Manville III* were the claims of certain asbestos tort plaintiffs against Travelers based on Travelers' alleged intentional suppression of information regarding the risks associated with asbestos and violation of certain purported duties to the plaintiffs to disclose those risks. *See Id.* at 57–58. Travelers moved to enjoin certain asbestos personal injury actions based on the bankruptcy court's injunction, and, after mediation, the parties entered into

---

[14] The Supreme Court reversed the Second Circuit on procedural grounds unrelated to the above discussion.

settlements. *See Id.* at 58. The settlements were approved by the bankruptcy court and conditioned on the bankruptcy court entering an order declaring that the actions were barred by the earlier channeling injunction. *See Id.* at 58–59. The bankruptcy court ultimately determined that the plaintiffs' actions violated the injunction, as would any future actions "arising out of" or" related to" Manville's insurance policies. *See Id.* at 59. On appeal, the District Court held that the bankruptcy court could enjoin the plaintiffs' claims, but did not have jurisdiction "to bar a suit alleging tortious conduct by Travelers on behalf of a non-Manville insured, conduct that is unrelated to Manville and not based on any knowledge of asbestos hazard gained from Manville, and that did not involve Manville asbestos or asbestos products." *In re Johns-Manville Corp.*, 340 B.R. 49, 63 65 (S.D.N.Y. 2006). On appeal, the Second Circuit held in *Manville III* that, unlike *Manville I*, the tort plaintiffs sought to recover directly from Travelers for its own purported misconduct, namely a breach of independent duties owed directly to the plaintiffs, and not for Manville's misconduct. *See Manville III*, 517 F.3d at 63. As such, Second Circuit held that the claims at issue *Manville III* were independent, non-derivative claims. *See Id.* at 68.

Further jurisprudence on the distinction between derivative claims and individual claims has developed in the aftermath of the liquidation of Bernard L. Madoff Investment Securities, LLC ("BLMIS"). For example, in *Marshall*, the Second Circuit considered whether the claims of certain creditors against non-debtor third parties were properly enjoined as claims derivative of those already asserted by the trustee. In the BLMIS liquidation, the trustee had used the "net investment method" to determine each customer's net equity in order to satisfy claims based on cash balances. *See Marshall*, 740 F.3d at 85 (2d Cir. 2014) (citing *In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R.

122, 125 (Bankr. S.D.N.Y. 2010)). Accordingly, the claim of one creditor, Marshall, against the BLMIS estate was allowed, but the claims of another creditor, Fox, were disallowed because Fox had withdrawn more than she initially deposited.

Separately, the BLMIS trustee had commenced an adversary proceeding asserting claims for avoidable preferences, fraudulent transfers, and turnover against a Madoff co-conspirator and related defendants (the "Picower Defendants"). While the parties to the adversary proceeding were engaged in settlement negotiations, Marshall and Fox filed complaints against the BLMIS trustee in Florida on behalf of a putative class allegedly adversely affected by the trustee's use of the net investment method in calculating their net equity. The bankruptcy court granted the trustee's request to enjoin the Florida actions, holding they "usurped causes of action belonging to the estate in violation of the Bankruptcy Code's automatic stay provision . . . and undermined the Bankruptcy Court's jurisdiction over administration of the BLMIS estate." *Marshall*, 740 F.3d at 86. The adversary proceeding was ultimately resolved consensually, and the settlement enjoined BLMIS customers and creditors of the BLMIS estate "from asserting any claim against the Picower BLMIS Accounts or the Picower Releasees *that is duplicative or derivative of the claims brought by the [t]rustee,* or which could have been brought by the trustee against the Picower BLMIS Accounts or the Picower Releasees" *Marshall*, 740 F.3d at 87 (emphasis in original). The settlement agreement was approved by the bankruptcy court and later affirmed by the District Court. *See Fox v. Picard (In re Madoff)*, 848 F. Supp. 2d 469, 491 (S.D.N.Y.2012).

Marshall and Fox appealed the District Court's decision affirming the bankruptcy court's approval of the settlement, and the Second Circuit held that Marshall and Fox could not proceed in the Florida actions because the "Florida actions [were] predicated

upon secondary harms flowing from BLMIS . . . rather than upon a particularized injury traceable to the Picower defendants' conduct," and as such, the Florida claims were derivative of the trustee's. *Marshall*, 740 F.3d at 90, 96. The court rejected arguments by Marshall and Fox that their Florida complaint asserted direct claims based on the defendants' participation in the theft of funds. Indeed, the court determined that the allegations in the Florida complaint "echo those made by the [t]rustee," particularly with respect to the defendants' knowledge of fraud. *See Id.* at 91. On the other hand, the court explained that "[t]he only allegations of the . . . defendants' direct involvement in the Ponzi scheme are that they prepared false documentation, recorded and withdrew fictional profits, and filed false statements in connection with their tax returns." *Id.* at 92. Importantly, the court pointed out that Marshall and Fox did not allege that the defendants took any "particularized" actions against them or the BLMIS customers they purported to represent:

> They have not alleged, for instance, that the Picower defendants made any misrepresentations to appellants. Appellants respond that their respective complaints allege that the Picower Defendants' wrongful conduct ensured the fraud's success *by inducing [them] and other customers to invest* (and remain invested) in BLMIS. We do not think that the complaints can reasonably be read in this way. Allegations that the Picower defendants knowingly reaped the benefits of Madoff's scheme through fraudulent withdrawals, and effected such withdrawals through backdating trades and recording fictional profits, does not amount to a particularized claim that they directly participated in defrauding BLMIS customers by inducing them to invest.

*Id.* at 93 (emphasis in original) (internal quotations omitted).

Recently, in *In re Tronox Inc.*, the District Court surveyed the existing jurisprudence and summarized the governing law in the Second Circuit with respect to the distinction between derivative claims belonging to a debtor and individual claims, which can be brought by a creditor. 549 B.R. 21 (S.D.N.Y. 2016), *appeal pending*, 16-

343 (2d. Cir. filed Feb. 4, 2016). At issue in *Tronox* was whether certain claimants were forced to look to a post-confirmation litigation trust created in the Tronox chapter 11 plan to recover damages for personal injuries, or whether they were permitted to pursue claims against the non-debtor parent company in a separate state court action. The chapter 11 plan of certain debtor entities (collectively, "Tronox") had created two post-confirmation trusts. *See Id.* at 35. First, the plan transferred Tronox's interests in fraudulent conveyance claims against non-debtors (new) Kerr-McGee Corp. and its parent Anadarko (together, the "Parent Entities") to a litigation trust (the "Litigation Trust"). The second trust (the "Tort Claims Trust") was created to serve as the sole recourse for tort claims against the debtors' estates, and was to be funded by a percentage of the Litigation Trust's recovery. The Litigation Trust and the United States Government jointly prosecuted an adversary proceeding against the Parent Entities that resulted in a settlement agreement, which was conditioned on an injunction barring future claims against the Parent Entities.

Sometime after the settlement agreement (including the provision regarding injunctive relief) was approved by the bankruptcy court and affirmed by the District Court, certain tort plaintiffs attempted to resurrect a state court action against Tronox and other affiliated entities. (New) Kerr-McGee Corp. filed a motion in the District Court to enforce the injunction against the plaintiffs in the state court action. One of the issues before the District Court in connection with the motion to enforce the injunction was whether the tort claims alleged in the state court action were derivative, and thus subject to the injunction entered by the Court when it approved the settlement agreement.

21

In analyzing the issue (and ultimately finding that, on the facts before it, the claims were foreclosed), the court summarized Second Circuit law on the issue of whether individual creditors can pursue claims:

> First . . . a claim belongs to the trustee—and not to individual creditors—either when the claim alleges harm to the debtor itself or when the harm alleged was generalized to all creditors of the debtor (e.g. a harm caused by the debtor), such that any liability for its acts is directly related to the bankrupt estate . . . .

> Second, the particularized nature of the harm caused by the debtor is not dispositive—the nature of harms can be different for any type of action. The core issue is, instead, whether creditors are impacted similarly . . . .

> [Third,] a claim belongs to individual creditors—and not to a debtor's trustee—when the harm suffered was particularized to those creditors, rather than to all creditors as a whole in their efforts to satisfy their claims against the debtor. In other words, if the action by the trustee would not and could not have resolved the creditors' claims, the claim is individualized. By the same token, where (for instance) a larger recovery on the very claim pursued by the trustee . . . would have led to a larger recovery by the creditor, that is certainly a strong indication that the claim is shared and derivative.

*In re Tronox Inc.*, 549 B.R. at 42.

### The Pasig Claims

These principles properly govern the pending motions. In ruling on Stay Motion I addressed to a prior version of the California complaint, Judge Gerber held that the claims asserted in the First Amended Complaint were grounded in particular, independent duties owed by Citco to Pasig and the Cormans, and not general injuries suffered by the general creditor body of the Soundview Debtors. In sum, Judge Gerber found that, based on the specific allegations and claims asserted, "the underlying gist of the [First Amended C]omplaint is that [the Cormans'] advisors served them badly." Dec. 16, 2015 Hrg. Tr. at 45:12–13.

Pasig and the Cormans now argue that the Trustees' Stay Motion II must be denied (and the Pasig Motion granted) because Judge Gerber's decision on Stay Motion

22

I allowing them to proceed in California is the law of the case. *See* Pasig Motion at ¶¶ 73–75. The law of the case doctrine, however, is not dispositive of the pending motions.15 As stated at the hearing on the pending motions, to be sure, the circumstances of Judge Gerber's retirement and my appointment to the Court should not create an opportunity for parties to relitigate issues that already have been decided or otherwise get a "second bite at the apple." However, since the ruling on Stay Motion I, Pasig and the Cormans have filed a newly amended complaint in the California Action, thereby mooting the Stay Motion I Denial Order.

The Court now has the Mirror Motions before it, and reviews the Pasig Second Amended Complaint, with the benefit of Judge Gerber's prior detailed analysis, under the governing legal principles outlined above. The pivotal question is whether the Second Amended Complaint also asserts what Judge Gerber found to be non-derivative, independent claims that establish injuries that are particularized to Pasig and the Cormans, and directly traceable to the Citco Defendants, as opposed to generalized injury to the Debtors or to the creditor body as a whole. *See* Dec. 16, 2015 Hrg. Tr. at 43:20–44:2; *see also St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989). If so, Pasig and the Cormans should be permitted, once again, to proceed with their case, including to finalize their settlement of the claims asserted in the California Action. If, on the other hand, the claims "derive" from the Debtors' rights or

---

15 The doctrine of law of the case is "an amorphous concept" and generically provides "that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983*), decision supplemented*, 466 U.S. 144 (1984). Nevertheless, "the law of the case doctrine 'does not rigidly bind a court to its former decisions, but is only addressed to its good sense.'" *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) (quoting *Higgins v. Cal. Prune & Apricot Grower, Inc.,* 3 F.2d 896 (2d Cir.1924) (Hand, J.)).

seek to redress harm suffered by the creditor body generally, the California Action should be enjoined and the claims should be pursued by the Trustees.

I find that the specific allegations in the Amended Complaint relied on by Judge Gerber remain substantially unchanged in the Second Amended Complaint (*Milin Decl.* [ECF No. 1211], Exh 4 (the "Sec. Am. Complaint")):

- Paragraph 37 (of the First Amended Complaint) [*Milin Decl.* [ECF No. 1211], Exh 3, (the "First Am. Complaint")] is now Paragraph 50 (of the Second Amended Complaint), and reads: "The Cormans accepted and relied upon Citco's representations that they would exercise good faith and judgment in managing their funds, as set forth above; and on that basis decided to move substantial monies from the Soros Assets to be under the management and control of Citco. These representations and promises were terms of the agreement between Citco and the Cormans. The Cormans entrusted their money to Citco in reliance on Citco's advice as their investment advisor and fiduciary, and based upon the representations and agreements described. As part of their agreement and in reliance on Citco's representations, Citco became the Cormans' personal investment advisor, agent, investment partner, fiduciary and manager of their monies." Sec. Am. Complaint at ¶ 50.

- Paragraph 38 (of the First Amended Complaint) is now Paragraph 51 (of the Second Amended Complaint), which reads: "In reliance on Citco's advice, representations, and agreements, the Cormans, including Pasig after 2002, transferred and committed their monies to Citco's management. Citco controlled the funds which the Cormans and/or Pasig had transferred to them over the years after 1996. If not for Citco's advice, representations, and agreements with the Cormans and Pasig, the Cormans would have remained invested with Soros as long as possible . . . ." Sec. Am. Complaint at ¶ 51.

- Paragraph 45 (of the First Amended Complaint), now Paragraph 55 (of the Second Amended Complaint), reads, in relevant part: "Citco transferred the management of the underlying investments . . . without informing the Cormans . . . ." Sec. Am. Complaint at ¶ 55.

- Paragraph 51 (of the First Amended Complaint), now Paragraph 60 (of the Second Amended Complaint), reads, in relevant part: "Citco knew or should have known of additional red flags, specifically enumerated herein below, that demonstrated that Fletcher would not be a good manager of the Cormans' investments and that transferring management of the investments to Fletcher would not be in the best interests of the Cormans." Sec. Am. Complaint at ¶ 60.

- Paragraph 54 (of the First Amended Complaint), now Paragraph 63 (of the Second Amended Complaint), reads, in part: "Citco knew or should have known that Fletcher repaid Citco loans with money that was invested with Fletcher by the Firefighter's Retirement System, Municipal Employees Retirement System, and New Orleans Firefights [*sic*] Pension Relief fund . . . ." Sec. Am. Complaint at ¶ 63.

- Paragraph 59 (of the First Amended Complaint), now paragraph 70 (of the Second Amended Complaint), reads, in part: "Citco . . . did not inform the Cormans that Fletcher would be a poor manager or that he was already engaged in fraud or mismanagement of other assets under his control, and did not give the Cormans an opportunity to decline to give control of their underlying investments to Fletcher." Sec. Am. Complaint at ¶ 70.

- Paragraph 60 (of the First Amended Complaint), now Paragraph 71 (of the Second Amended Complaint), reads, in part: "Rather than furthering the best interests of the Cormans, Citco's actions in transferring the management of the funds were instead adverse to the Cormans' best interests, and designed to further Citco's own interests." Sec. Am. Complaint at ¶ 71.

- Paragraph 70 (of the First Amended Complaint), now paragraph 87 (of the Second Amended Complaint), begins the First Cause of Action for Breach of Fiduciary Duty. Specifically, paragraph 75 (of the First Amended Complaint), now paragraph 92 (of the Second Amended Complaint), alleges that the defendants breached duties owed to Pasig and the Cormans, and not the creditor body as a whole of the Debtors generally. Paragraph 92, reads, in part: "Defendants, including all entities and individuals named as Defendants, breached their fiduciary duties to Plaintiffs and failed to act as a reasonably careful personal investment advisor, agent, investment partner, and manager and trustee for Pasig, would have acted under the same or similar circumstances . . . ." Sec. Am. Complaint at ¶ 92.

- Paragraph 82 (of the First Amended Complaint), now paragraph 101 (of the Second Amended Complaint), is now broader, but continues to assert duties owed particularly to Pasig and the Cormans to "inform Plaintiffs [Pasig and the Cormans] of the circumstances of the transfer of management [of their investments] to Fletcher . . . ." Sec. Am. Complaint at ¶ 101.

- Paragraph 93 (of the First Amended Complaint),[16] now paragraph 116 (of the Second Amended Complaint), is now broader in scope, but the allegations remain substantially the same. Sec. Am. Complaint at ¶ 116.

---

[16] Although Judge Gerber referred to paragraph 99, upon reviewing the First Amended Complaint, it appears he was referring to paragraph 93.

- Paragraph 115 (of the First Amended Complaint), now paragraph 126 (of the Second Amended Complaint), is now more specific and reads: "Defendants represented that Plaintiffs [Pasig and the Cormans] could personally count on Defendants Unternaehrer and Smeets and other Citco Executives at the highest level, to make decisions and handle Plaintiffs' money in their best financial interest and that Defendant Smeets was the Soros of Citco and would personally be involved with the management of Plaintiffs' investments." Sec. Am. Complaint at ¶ 126.

- Paragraph 130 (of the First Amended Complaint), now paragraph 143 (of the Second Amended Complaint), now contains more detail regarding the breach of contract claims, a claim particular to Pasig and the Cormans. Sec. Am. Complaint at ¶ 143.[17]

In addition, the Second Amended Complaint contains new allegations apparently plead in response to the California court's ruling on the Citco Defendants' demurrer to the First Amended Complaint, which required greater clarity and specificity.[18] The added allegations further demonstrate the independent and particularized nature of the claims asserted in the California Action:

---

[17] Other relevant paragraphs are:

- Paragraph 26, now paragraph 31: "Unternaehrer represented and agreed with the Cormans that Citco would be the Cormans' personal investment advisor and an investment partner with the Cormans. He represented to them and agreed that their investments with Citco would be safe and secure, and that Citco would administer and manage their money to ensure continued high performance. Unternaehrer represented and agreed that the Cormans could personally count on him and other Citco executives at the highest level, including Smeets, the CEO of the parent Citco Group Limited, to make decisions regarding the placement of, and handling of the Cormans money in their best financial interest. Unternaehrer represented and agreed with the Cormans that Citco would be a fiduciary for them, and that the Cormans could trust and rely on Citco regarding their investment advice, managing, and administering of the Cormans money. Unternaehrer told them that Citco would direct and look after their investments so that they could focus on their film work." Sec. Am. Complaint at ¶ 31.

- Paragraph 32, now paragraph 34: "Unternaehrer also represented to the Cormans and agreed that Citco would place and keep its own monies invested side by side with the Cormans monies so the Cormans would be fully protected by Citco." Sec. Am. Complaint at ¶ 34.

[18] In its Minute Order, the California court sustained Citco's demurrers for failure to "state facts sufficient to constitute a cause of action" under California's Code of Civil Procedure § 430.10(e). The California Court gave Pasig and the Cormans five days leave to amend and file a Second Amended Complaint. *See Milin Decl.*, [ECF No. 1211], Exh 7 (the "Minute Order") at 1.

26

- Paragraph 26, now Paragraph 28, has been revised to read, in part: "Citco knew, as administrator of the Cormans' Soros investments that Soros was managing tens of millions for the Cormans in 1996. Unternaeherr met with the Cormans and solicited them to be a client of Citco's investment management and financial advice services knowing that Roger Corman was 70 years old. Citco also knew that the Cormans were potentially major clients for Citco and that it would make millions of dollars in fees for acting as the Cormans' investment manager and financial advisors." Sec. Am. Complaint at ¶ 28.

- (New) Paragraphs 39 through 41 of the Second Amended Complaint allege personal meetings and representations by Messrs. Unternaehrer and Smeets that induced the Cormans to move their monies from the Soros funds to Citco. For example: It is alleged that Unternaehrer's false representation to the Cormans and Pasig from a 1996 meeting that "Smeets would be personally involved in managing the Cormans' money," and that Citco would place and keep its own monies invested side by side with the Cormans' monies" were "intentionally made by Unternaehrer for himself and Citco, with the intent to deceive the Cormans and to induce them to agree to move their monies from Soros to Citco . . . ." Sec. Am. Complaint at ¶¶ 39–41.

- (New) Paragraphs 42 through 46 of the Second Amended Complaint allege specific conduct by the Citco Defendants between 1996 and 2002 (well before the Richcourt Acquisition in which Citco transferred the Debtors to Fletcher), including additional representations allegedly made to the Cormans, and implied contracts and correspondence with the Cormans, all of which was for the goal of inducing the Cormans to move monies from the Soros investments to Citco's management. Sec. Am. Complaint at ¶¶ 42–46.

- (New) Paragraphs 47 through 48 of the Second Amended Complaint similarly allege specific conduct by the Citco Defendants between 1996 and 2002 (well before the Richcourt Acquisition), including representations made directly to the Cormans, and other communications and dealings with the Cormans, all of which were for the purpose of moving the Cormans' money from the Soros investments to Citco-managed funds. Sec. Am. Complaint at ¶¶ 47–48.

The Court finds that these representative paragraphs from the Second Amended Complaint make clear that the gravamen of the California Action is that Citco engaged in wrongful conduct targeted directly at Pasig and the Cormans, resulting in harm particular to them. Significantly, counsel to Citco in the Trustees' adversary proceeding against Citco pending before this Court has voluntarily submitted a declaration in

connection with the Pasig Motion in which he advises that the parties to the California

Action—Pasig, the Cormans, and Citco—have settled in principle only individual claims

of the Cormans and Pasig and not derivative claims belonging to the Debtors:

> In its acceptance of the settlement proposal of the California Action, Citco confirmed, in writing, "Citco is not paying any of the settlement amount on the claims of the Trustee and is paying all of the settlement amount to settle claims individually owned by the Cormans, and that its counsel will work in good faith with the Cormans' California trial counsel and bankruptcy counsel to document this in the definitive agreement."

*Citco Declaration* [ECF No. 1214] at ¶ 3. As noted, *see* n. 13 *supra*, there followed a

flurry of letters to the Court from Citco [ECF Nos. 1231 and 1233], from the Trustees

[ECF No. 1232], and from Pasig and the Cormans [ECF No. 1244], debating whether the

Court should rule that, in the event the parties are authorized to settle the California

Action, Citco is precluded from attempting to offset any future recovery by the Trustees

in the Citco Adversary Proceeding against amounts paid to Pasig and the Cormans

pursuant to the California Settlement. While Citco may well be estopped from

subsequently asserting positions inconsistent with representations made to the Court in

connection with the pending Mirror Motions, that issue is not before the Court on these

motions. For present purposes, the Citco Declaration makes clear that any amount paid

to Pasig and the Cormans to settle the California Action is intended to "settle claims

individually owned by the Cormans" and Citco is "not paying any of the settlement

amount on the" claims asserted in the Citco Adversary Proceeding.

Based on a careful review of the allegations contained in the Second Amended

Complaint coupled with the representations in the Citco Declaration, the Court finds

that the Second Amended Complaint in the California Action, which the parties seek to

resolve pursuant to the MOU, alleges non-derivative, independent claims predicated on

purported injuries personal to Pasig and the Cormans that can be directly traced to individualized conduct the Citco Defendants directed at the Cormans and Pasig. The claims asserted in the California Action are direct; Pasig and the Cormans have allegedly suffered particularized harm from breach of independent duties purportedly owed to them by certain Citco Defendants. Specifically, the claims asserted in the California Action are not based on Citco's relationship with the Debtors, nor derivative of any injury that may have been suffered by the Debtors and the creditor body as a whole, but are based on injuries to the Cormans and Pasig allegedly resulting from Citco's role as the personal investment advisor to Pasig and the Cormans. Analysis of the Second Amended Complaint under the framework of the case law discussed above leads to the conclusion that Pasig and the Cormans may pursue (and compromise) their claims against the Citco Defendants in California.

While none of the governing cases is factually identical to this one, collectively they are instructive, particularly given that the automatic stay is intended to protect the *res* of the debtor's estate. For example, unlike the claims at issue in *Marshall* (which were enjoined as derivative), what Pasig and the Cormans seek in their California Action is not redress for their loss as creditors of the Debtors (which would be injury they have in common with the general creditor body and as such, barred by the automatic stay), but rather their individualized losses allegedly uniquely caused by wrongful conduct of Citco in mismanaging their personal investments and inducing them to transfer their investments from Soros managed funds to the Debtor funds. *See, e.g.*, Sec. Am. Complaint at ¶¶ 28, 41, 45, 48, 50–51, 55, 60, 63, 70–71, 92, 101, 116, 127, and 143. Those allegations in the Second Amended Complaint are certainly specific to Pasig and the Cormans, and are not in any respect applicable to the Debtors or their creditor body

as a whole. Moreover, in contrast to the allegations at issue *Marshall* discussed above, the complaint in the California Action does in fact allege that the Cormans were personally induced by Unternaehrer to invest with Citco. *See, e.g.*, Sec. Am. Complaint at ¶¶ 28–32; *cf. In re Madoff*, 848 F. Supp. 2d 469, 479 (S.D.N.Y. 2012) (finding "[t]he Florida complaints contain no additional allegations of acts by the Picower defendants that were directed toward the Appellants specifically, or any duty owed specifically to the Appellants by the Picower defendants. Put bluntly, the wrongs pleaded in the Florida Actions and in the [t]rustee's action are the same."). The Cormans seek to recover from Citco not for what Fletcher may have done to harm the Debtors, but rather for particularized harm to the Cormans since uniquely they allegedly would not have been invested in the Debtors but for the inducement by Citco and its representatives. Any harm suffered by Pasig and the Cormans therefore arises allegedly from breach of those duties Citco owed specifically to them as personal investment advisor. *See* Sec. Am. Complaint at ¶¶ 88, 92.

Pasig and the Cormans are not barred from pursuing their individual claims against Citco even though the Debtors may also have claims against the same third party. *See, e.g.*, *Bankers Trust Co. v. Rhoades*, 859 F.2d at 1101. And, the third proposition explicated by *Tronox* is applicable here: the harm allegedly suffered by Pasig and the Cormans was particularized to them by virtue of Citco's long time role as the Cormans' personal investment advisor. The Trustees cannot resolve any claims arising from that relationship.

One can not dispute that some of Pasig and the Cormans' losses are "secondary harm" (since they are based on harm to the Debtors themselves), but their secondary injury can be particularized and directly attributed to alleged wrongful conduct of Citco

directed specifically at Pasig and the Cormans. *See Marshall*, 740 F.3d at 89. While any recovery by the Trustees could compensate Pasig and the Cormans for losses caused by the Richcourt Acquisition, the Trustees cannot make Pasig and the Cormans whole for Citco's alleged breaches of duties purportedly owed by virtue of Citco's role as the Cormans' personal investment advisor.

The specific causes of action plead in the Second Amend Complaint based on these factual allegations are personal to Pasig and the Cormans. For example, the first cause of action for breach of fiduciary duty against all defendants is grounded in the alleged fiduciary duties owed to Pasig and the Cormans by the Citco Defendants in their capacity as "personal investment advisor, agent, investment partner, and manager of [Pasig and the Cormans'] investments and Trustee of Pasig . . . ." Sec. Am. Complaint at ¶ 88 (emphasis added). This relationship is alleged to have begun as early as 1996, nearly twelve years before the Richcourt Acquisition. *See Id.* Pasig and the Cormans also allege, based on Citco's role as their personal investment advisor, that Citco had "an independent duty to [Pasig and the Cormans] to inform them of the circumstances of the transfer of management of the [t]ransferred [a]ssets to Fletcher." *See* Sec. Am. Complaint at ¶ 90. This cause of action is particular to Pasig and the Cormans.

The second cause of action for constructive fraud against Citco also finds its roots in the fiduciary duties Citco purportedly owed directly to Pasig and the Cormans. *See* Sec. Am. Complaint at ¶¶ 100–02. Therefore, it too is particularized as to Pasig and the Cormans. Similarly, the third cause of action for concealment against all Citco Defendants also is grounded in Citco's alleged breach of the fiduciary duties owed directly to Pasig and the Cormans, not to the Debtors or the creditor body as a whole. *See* Sec. Am. Complaint at ¶¶ 114–17. In fact, Pasig and the Cormans specifically allege

that Citco "intended to deceive" *them* particularly by concealing the transfer to Fletcher. *See* Sec. Am. Complaint at ¶¶ 118–19.

Likewise, the fourth cause of action is based on the long-standing relationship Citco had directly with Pasig and the Cormans, dating back to the 1990s, and the statements Citco allegedly made to induce them into investing. *See* Sec. Am. Complaint at ¶¶ 125–28. It was the specific statements made to induce Pasig and the Cormans to invest with Citco that form the predicate for Pasig and the Cormans' intentional misrepresentation cause of action. *See* Sec. Am. Complaint at ¶¶ 128–36.

The fifth cause of action for breach of oral and implied contracts is also particular to Pasig and the Cormans. For example, one of the bases for this cause of action is the "implied contract with Citco and [Pasig and the Cormans] created by the course of conduct of Citco from 1996 onward and the fact that it . . . act[ed] as [the Corman's personal] financial advisor, money manager, fiduciary, controlled the investments of the Cormans and Pasig, and took millions of dollars in fees" for services performed. Sec. Am. Complaint at ¶ 140.

In sum, the Second Amended Complaint is clear: the alleged wrongful conduct of Citco at issue in the California Action was directed at the Cormans and Pasig, and the injury alleged is specific to the Cormans and Pasig. Moreover, the Trustees could not recover damages for those injuries uniquely suffered by Pasig and the Cormans. *See Hirsch*, 72 F.3d at 1093. As such, the Court finds that Pasig and the Cormans have met their burden to prove that the automatic stay is inapplicable to the California Action.[19]

---

[19] The Court finds that the Trustees' argument regarding "reflective loss" is unavailing and unpersuasive. This argument is essentially the same argument raised by Citco in its demurrer to the First Amended Complaint in the California Action and was rejected by the California court in its Minute Order dated January 11. *See Milin Decl.* [ECF No. 1211], Exh 7 (the "Minute Order"). Specifically, the California

There is, however, as previously noted, some overlap between the California Action and the Citco Adversary Proceeding insofar as each contains allegations with respect to, and seeks damages arising from, Citco's conduct and involvement in the Richcourt Acquisition. That being said, it is undeniable that Citco owed independent duties to Pasig and the Cormans, and the relationship between the parties to the California Action spanned years before the Richcourt Acquisition. The statements Citco allegedly made to Pasig and the Cormans, and the resulting agreement between those parties, are particularized, direct, and independent of any claims the Debtors may have against Citco.

The Trustees posit that the California settlement could arguably impact the Debtors' estates by arming the Citco Defendants with offset arguments aimed at reducing their liability to the estates in the Citco Adversary Proceeding. The Trustees therefore argue, in the alternative, that the Court should exercise its powers under section 105(a) of the Bankruptcy Code to enjoin the California Action pending resolution of the Citco Adversary Proceeding. *See* Stay Motion II at 25–27. Having again found the automatic stay inapplicable to Pasig and the Cormans' individual claims, the Court finds no basis to issue an injunction under section 105(a).

Moreover, it bears repeating that, as Judge Gerber has previously expressly found, what the Cormans and Pasig may recover in their California Action is not property of the estate. *See* Dec. 16, 2015 Hrg. Tr. at 56:20–21. Based on this ruling and the representations of Citco and Pasig and the Cormans that they are settling only

court held that "[a]lthough there is certainly language in the [First Amended Complaint] wherein the individual plaintiffs appear to be seeking damages for the future lost profits of Pasig, the gravamen of the complaint as to the Cormans is the wrongful conduct that led the Plaintiffs to invest their money with Citco." Minute Order at 7.

individual claims, and that Citco is not paying for claims of the Debtor, the settlement should have no effect on the Debtors' prosecution of the Citco Adversary Proceeding. Significantly, as noted above, Pasig and the Cormans could have settled the California Action after Judge Gerber's ruling since the Trustees did not seek a stay of the Order denying Stay Motion I. Indeed, all of the Parties, including the Trustees, agree that Citco and Pasig and the Cormans were free—without any risk of violating the automatic stay— to settle their dispute based on the First Amended Complaint and the Stay Motion I Denial Order. *See* Oct. 20 Hrg. Tr. at 80:7–9; 81:13–21

The Debtors' concerns that Citco might seek a reduction in damages awarded against it in the Citco Adversary Proceeding while speculative, are not entirely unfounded however. *See* Debtors Obj. ¶ 55 (citing the Apr. 19, 2016 Hrg. Tr.). To be sure, Pasig and the Cormans have stated they are entitled to collect the entire amount on their claims from both Citco and the Debtors' estates. *See* Pasig Reply [ECF No. 1212] ¶ 8. And, at an early hearing pre-dating the argument on the Mirror Motions and the Citco Letter, counsel for Citco explicitly stated on the record that "with regard to damages, [Citco's] position is [that] the folks from Pasig can recover from us once." *April 19, 2016 Hearing Transcript* [ECF No. 1069] at 31:5–6. Since the hearing on the Mirror Motions, Citco's counsel has taken the position that given the uncertainties surrounding the Citco Adversary Proceeding, any determination as to whether Citco may offset any damages is premature at this point. *See* Citco Letter, ECF 1231.

At the same time, as discussed above, counsel to Citco in the Citco Adversary Proceeding pending before this Court submitted the Citco Declaration, which confirms that by settling the California Action, Citco is merely resolving Pasig and the Cormans'

individual claims, and not those belonging to the Trustee.[20] These representations should provide some level of comfort with respect to the Trustees' concern in that, as noted above, their representations may well operate to estop Citco should it seek in the future to claim offset against any recovery by the Trustees against Citco. That is an issue for another day.

With respect to the issue framed by the pending motions, based on the allegations in the Second Amended Complaint and applicable law in this Circuit, it is clear that Pasig and the Cormans have alleged wrongdoing that was specifically directed at them. As such, any settlement entered into between Pasig, the Cormans, and the Citco Defendants in the California Action can only resolve the individual claims of Pasig and the Cormans. Therefore, Pasig and the Cormans are permitted to pursue (and to settle) their *individual claims* in the California action against the Citco Defendants, but <u>not</u> any claims that the Debtors have or may have against the defendants in the Citco Adversary Proceeding.

So ordered.

Dated: New York, New York
       March 27, 2017

                                    *s/ Mary Kay Vyskocil*
                                    Honorable Mary Kay Vyskocil
                                    United States Bankruptcy Judge

---

[20] In their response to the Pasig Motion, the Debtors contend the statements made with respect to the California settlement are inadmissible hearsay not properly considered. Pasig, on the other hand, contends the statements are not hearsay, and the court may consider the legally operative statement. *See* Pasig Reply ¶ 6. The Court finds the Citco statements relevant only to the extent that, in the future, they could be admissible as a party admission or might work a judicial estoppel should Citco later attempt to argue inconsistently in the Adversary Proceeding.